UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　　Plaintiff,<br>vs.<br>FRANKIE ALLEN PERAZA,<br>　　　　　　Defendant. | Case No. 2:14-cr-00229-APG-NJK<br><br>REPORT & RECOMMENDATION<br><br>(Docket No. 61) |

This matter was referred to the undersigned Magistrate Judge on Defendant Frankie Allen Peraza's Motion to Suppress Defendant's Statement. Docket No. 61. On May 17, 2016, the Court held an evidentiary hearing on Defendant's motion. Docket No. 70. On June 27, 2016, the Court held a continued evidentiary hearing on Defendant's motion. Docket No. 86. The Court has considered Defendant's Motion, the United States' Response, Defendant's Reply, Defendant's Supplement to his Motion, the United States' Response to Defendant's Supplement, Defendant's Supplemental Reply, the evidence adduced at the evidentiary hearings on this matter, and the parties' arguments. Docket Nos. 61, 64, 67, 70, 86, 93, 96, 97.[1]

I. **BACKGROUND**

　　A. **Testimony of Detective Lora Cody**

On May 28, 2013, at approximately 9:00 a.m., Las Vegas Metropolitan Police Department (LVMPD) Detective Lora Cody arrived at the residence of Defendant Frankie Allen Peraza in Las Vegas, Nevada, in order to execute a search warrant for evidence of child pornography crimes. Hearing Tr. (5/17/2016) at 11:14 a.m. Detective Cody testified that the search warrant was executed

---

[1] Citations to the recording of the hearing are noted by "Hearing Tr." followed by the relevant date and time of the hearing, as no written transcript has been prepared.

1    at approximately 10:30 a.m. Hearing Tr. (5/17/2016) at 11:14 a.m. Prior to the execution of the
2    search warrant, Detective Cody had information that Defendant was in the residence, as well as
3    another potential adult, and a potential minor child. Hearing Tr. (5/17/2016) at 11:16 a.m.
4    LVMPD's SWAT team made entry, per LVMPD's policy, because the residence had security screens
5    on the windows and possible security bars on the doors, and because pictures on Defendant's
6    Facebook account indicated he may have weapons in the residence. Hearing Tr. (5/17/2016) at 11:16
7    - 11:17 a.m., 11:41 a.m. Detective Cody did not make copies of these pictures for SWAT, and did
8    not refer to them in her reports regarding this case. Hearing Tr. (5/17/2016) at 11:41-11:42 a.m.
9    Detective Cody and her team briefed with SWAT prior to entry into the residence. Hearing Tr.
10   (5/17/2016) at 11:18 a.m. She provided SWAT a copy of the search warrant and pictures of the
11   residence, and advised them who she believed was in the residence at the time as well as any
12   potential threats. Hearing Tr. (5/17/2016) at 11:39 a.m., 11:42 a.m. She told SWAT that Defendant
13   had pictures of weapons on his Facebook page. Hearing Tr. (5/17/2016) at 11:39 a.m.

14          When Detective Cody arrived at the residence, SWAT had already served the search warrant.
15   Hearing Tr. (5/17/2016) at 11:18 a.m. SWAT pulls residents out of the property when it serves a
16   search warrant and holds them outside while calling the Detective on the search warrant. Hearing
17   Tr. (5/17/2016) at 11:18 a.m. Therefore, when Detective Cody arrived at Defendant's residence at
18   approximately 10:45 or 10:50 a.m., Defendant was already outside, though Detective Cody cannot
19   recall if he was restrained. Hearing Tr. (5/17/2016) at 11:18 a.m., 11:20 a.m., 11:56 a.m. She saw
20   no evidence of forcible entry into the residence. Hearing Tr. (5/17/2016) at 11:19 a.m. Detective
21   Cody made contact with Defendant when she arrived at the residence, which was approximately 45
22   minutes after SWAT made entry into the residence. Hearing Tr. (5/17/2016) at 11:20 a.m.

23          When Detective Cody arrived at the residence, there were eight law enforcement officers
24   present, in order to search the residence. Hearing Tr. (5/17/2016) at 11:23 a.m., 12:04 p.m. Out of
25   the eight law enforcement officers, including Detective Cody, five carried firearms. Hearing Tr.
26   (5/17/2016) at 12:04 p.m. No one on the team pulled out a firearm that day. Hearing Tr. (5/17/2016)
27   at 12:12 p.m. All of the officers were in plain clothes, which Detective Cody described as jeans,
28   tennis shoes, and a collared shirt with the Internet Crimes Against Children task force logo on it.

1    Hearing Tr. (5/17/2016) at 11:24 a.m., 12:04 p.m., 12:12 p.m. Detective Cody had a firearm on her
2    hip, covered by her polo shirt. Hearing Tr. (5/17/2016) at 11:24 a.m. She did not put her hand on
3    her firearm at any time. Hearing Tr. (5/17/2016) at 11:24 a.m. She did not uncover the firearm or
4    remove it from its holster at any time during her contact with Defendant. Hearing Tr. (5/17/2016)
5    at 11:25 a.m. When Detective Cody first made contact with Defendant, the other officers were all
6    outside the residence, taking photographs. Hearing Tr. (5/17/2016) at 11:24 a.m. Once photographs
7    are taken of the outside of the residence, officers enter the residence. Hearing Tr. (5/17/2016) at
8    11:24 a.m.

9    When Detective Cody arrived at the location, as case agent, she took an overview of the
10   premise. Hearing Tr. (5/17/2016) at 11:58 a.m. She walked through the premise, and debriefed
11   other task force officers, including any who may have had contact with Defendant. Hearing Tr.
12   (5/17/2016) at 11:58 a.m.

13   Detective Cody then made contact with Defendant, gave him a copy of the search warrant,
14   and told him that she was there for the execution of the search warrant. Hearing Tr. (5/17/2016) at
15   11:23 a.m. She saw Defendant read the search warrant, and believes he read it in its entirety.
16   Hearing Tr. (5/17/2016) at 11:39 a.m. She then asked if he would come with her into her vehicle
17   and speak with her about the circumstances surrounding the seach warrant. Hearing Tr. (5/17/2016)
18   at 11:22 a.m.; 11:23 a.m. These conversations occurred before Detective Cody turned on her
19   recorder. Hearing Tr. (5/17/2016) at 11:59 a.m., 12:14 p.m. Detective Cody and Defendant walked
20   to her car together, side-by-side, and Defendant was not restrained. Hearing Tr. (5/17/2016) at 11:40
21   a.m. Detective Cody's vehicle is a white Nissan Quest minivan. Hearing Tr. (5/17/2016) at 11:25
22   a.m. It has small plastic lights on the visor that can be seen if the visor is flipped down, and also has
23   a small radio holster. Hearing Tr. (5/17/2016) at 11:25 a.m. The vehicle does not have a computer
24   or any type of caged area inside. Hearing Tr. (5/17/2016) at 11:25 a.m. Defendant willingly went
25   to the vehicle with Detective Cody, and that is where she interviewed him. Hearing Tr. (5/17/2016)
26   at 11:22 a.m.; 11:26 a.m.

27   When Detective Cody initiated her interview with Defendant, SWAT was no longer on the
28   scene, and Defendant was not restrained, not even by a seat belt. Hearing Tr. (5/17/2016) at 11:21

1  a.m., 12:14 p.m. SWAT left the location at about 10:30, and Detective Cody initiated her interview
2  with Defendant at 11:10 or 11:15. Hearing Tr. (5/17/2016) at 11:21-11:22 a.m., 11:56 a.m. During
3  the interview, Detective Cody was in the driver's seat of her vehicle, and Defendant was in the
4  passenger seat. Hearing Tr. (5/17/2016) at 11:26 a.m. The doors were not locked and the closest
5  law enforcement officer was about 100 feet away, standing near the residence, but not concealed.
6  Hearing Tr. (5/17/2016) at 11:26 a.m., 12:07 p.m. While Detective Cody and Defendant were in her
7  vehicle, Detective Cody gave Defendant the search warrant, had him read it, and explained to him
8  what it was, to make sure he understood it. Hearing Tr. (5/17/2016) at 11:22 a.m. Defendant had
9  no questions about the seach warrant at that time. Hearing Tr. (5/17/2016) at 11:22 a.m.

10       Detective Cody did not intend to place Defendant in custody that day, did not consider him
11 to be in custody, and explained that to him. Hearing Tr. (5/17/2016) at 11:27 a.m. She also
12 explained to Defendant that her search warrant did not authorize law enforcement to arrest anyone
13 at that time. Hearing Tr. (5/17/2016) at 11:27 a.m. Specifically, Detective Cody advised Defendant
14 she had a search warrant; asked him if he wanted to speak with her; told him that no one was under
15 arrest at the time; that it was the beginning of the investigation; and that she wanted him to know his
16 rights. Hearing Tr. (5/17/2016) at 11:27-11:28 a.m.

17       Defective Cody told Defendant that the search warrant was specifically for CDs, DVDs,
18 computers - basically, anything that can contain electronic media. Hearing Tr. (5/17/2016) at 11:34
19 a.m., 12:01 p.m. "Specifically, we're here because someone from this residence has been
20 downloading and uploading child pornography." Hearing Tr. (5/17/2016) at 11:34 a.m. She also
21 told Defendant, "the warrant is just for the items inside the house, it's not for you - which means that
22 you can come and go. You can leave if you want to, you can stay, it's up to you. We're not going
23 to restrict you from leaving." Hearing Tr. (5/17/2016) at 11:34 a.m. "Nobody's under arrest, so I
24 want to make sure that you do understand that." Hearing Tr. (5/17/2016) at 11:34 a.m. "If you do
25 stay, that's great, but we're going to have to have you stay in one specific location - can't have you
26 moving around while we're conducting a search inside the residence." Hearing Tr. (5/17/2016) at
27 11:34 a.m., 12:03 p.m. Detective Cody told Defendant that he would have to stay in one location
28 for officer safety - officers don't know if there are weapons inside the house, and can't have residents

- 4 -

1  "running around" inside the residence. Hearing Tr. (5/17/2016) at 11:36 a.m. Detective Cody told
2  Defendant that, if he did leave, she would have to call a locksmith to secure his residence when law
3  enforcement finished executing the search warrant, and he would have to pay for the locksmith.
4  Hearing Tr. (5/17/2016) at 11:34-11:35 a.m., 12:03 p.m.

5        Although Defendant was not in custody, Detective Cody read him his *Miranda* rights because
6  she thinks everyone should be aware of his rights, and because law enforcement officers were present
7  at the residence. Hearing Tr. (5/17/2016) at 11:28 a.m., 11:35 a.m., 12:02 p.m. Additionally, she
8  used them as a precaution to reiterate to Defendant that he did not have to speak to her. Hearing Tr.
9  (5/17/2016) at 11:28 a.m., 12:02 p.m. Further, it is her understanding that it is common practice to
10 read these rights to a defendant before questioning him even when he is not in custody. Hearing Tr.
11 (5/17/2016) at 11:29 a.m. Detective Cody read Defendant his *Miranda* rights off her LVMPD-issued
12 2010 card, which she read in its entirety. Hearing Tr. (5/17/2016) at 11:29 a.m. At the time,
13 Detective Cody kept that card inside her vehicle. Hearing Tr. (5/17/2016) at 12:05 p.m. That card
14 was changed in the latter half of 2013. Hearing Tr. (5/17/2016) at 12:05 p.m. Specifically, Detective
15 Cody said, "You have the right to remain silent. Anything you say can be used against you in a court
16 of law. You have the right to the presence of an attorney. If you cannot afford an attorney, one will
17 be appointed for you. You understand?" Hearing Tr. (5/17/2016) at 11:35 a.m. Defendant then
18 asked if he was being arrested, and Detective Cody told him he was not under arrest and she had no
19 intention of arresting him that day. Hearing Tr. (5/17/2016) at 11:29 a.m., 11:35 a.m.

20       At the beginning of the interview, Detective Cody asked Defendant questions about who was
21 in the house, how many computers are in the house, and who the computers belong to. Hearing Tr.
22 (5/17/2016) at 11:30 a.m. Then, she asked specifically whether file-sharing programs are used, and
23 whether law enforcement would find any pornography or child pornography in the house. Hearing
24 Tr. (5/17/2016) at 11:30 a.m. Defendant never hesitated in answering any questions put to him by
25 Detective Cody. Hearing Tr. (5/17/2016) at 11:31 a.m. Defendant never asked to end the interview,
26 and never raised the topic of wanting or needing an attorney. Hearing Tr. (5/17/2016) at 11:31 a.m.
27 While Detective Cody questioned Defendant regarding one of his computers, he answered in a
28 manner that offered additional information. Hearing Tr. (5/17/2016) at 11:31 a.m.

1    The interview itself lasted a little over 14 minutes. Hearing Tr. (5/17/2016) at 11:31-11:32
2    a.m. After the interview ended, Defendant went back inside the residence. Hearing Tr. (5/17/2016)
3    at 11:36 a.m. He stayed on the couch, which is where he was told to sit, while law enforcement
4    searched the residence, and while an armed officer watched to make sure he did not move around.
5    Hearing Tr. (5/17/2016) at 11:37 a.m., 12:03 p.m. Detective Cody did not arrest Defendant that day.
6    Hearing Tr. (5/17/2016) at 12:13 p.m.

   **B.    Testimony of Defendant Frankie Allen Peraza**

8    On May 28, 2013, Defendant Frankie Allen Peraza was sitting on his couch, eating a bowl
9    of cereal and watching television. Hearing Tr. (5/17/2016) at 12:17 p.m., 12:31 p.m. At some point,
10   he heard a bang and looked out the window of his residence. Hearing Tr. (5/17/2016) at 12:17 p.m.
11   When he looked outside, Defendant saw a SWAT car directly in front of his window. Hearing Tr.
12   (5/17/2016) at 12:18 p.m. He then looked toward the left, and saw a "bunch" of officers and another
13   SWAT truck in his driveway. Hearing Tr. (5/17/2016) at 12:18 p.m. Defendant then heard someone
14   on a "blowhorn" say, "We see you, Frankie Peraza, come out with your hands up." Hearing Tr.
15   (5/17/2016) at 12:18 p.m. Defendant was scared and confused, and did not know what was
16   happening. Hearing Tr. (5/17/2016) at 12:29 p.m.[2] Defendant looked outside again, waited a few
17   minutes, and then walked to the front door, wondering what was going on. Hearing Tr. (5/17/2016)
18   at 12:18 p.m. He opened the door, and officers told him to come outside. He then opened the
19   second, secured door to his residence and walked outside. Hearing Tr. (5/17/2016) at 12:18 p.m.
20   SWAT officers pointed their guns at him[3] and told Defendant to put his hands up and walk outside
21   backwards. Hearing Tr. (5/17/2016) at 12:18-12:19 p.m., 12:32 p.m. Defendant complied and, as
22   soon as he got outside the gate, two officers restrained his hands. Hearing Tr. (5/17/2016) at 12:19

---

[2] This was Defendant's testimony on direct examination. On cross examination, however, he testified that he was not scared and confused when he was called outside. Rather, he became scared and confused when he saw the guns, and that he was confused when he first saw the officers. Hearing Tr. (5/17/2016) at 12:32 p.m. He later testified that he became scared and confused when he saw "the SWAT." Hearing Tr. (5/17/2016) at 12:39 p.m.

[3] On cross examination, Defendant agreed with the prosecution's description that SWAT officers never burst into his house and pointed guns at him, but that he simply saw guns when he left the residence. Hearing Tr. (5/17/2016) at 12:34 p.m.

- 6 -

1   p.m., 12:20 p.m., 12:32 p.m. It took Defendant a matter of seconds to walk backwards to the
2   officers. Hearing Tr. (5/17/2016) at 12:33 p.m. Defendant did not know why the officers had "so
3   many guns," and thought that maybe they thought he had drugs. Hearing Tr. (5/17/2016) at 12:29
4   p.m. The two officers then took Defendant down to the end of the driveway and handed him off to
5   a police officer, who took him about two houses away from his residence. Hearing Tr. (5/17/2016)
6   at 12:19 p.m.

7   After approximately 20-30 minutes, the uniformed male officer took Defendant to the fence
8   at his residence. Hearing Tr. (5/17/2016) at 12:21 p.m., 12:34 p.m. Detective Cody came out of
9   Defendant's residence and approached him, then said, "Let's go talk over here to get away from
10  everything." Hearing Tr. (5/17/2016) at 12:21 p.m. The officer took Defendant to Detective Cody's
11  van and removed his restraints. Detective Cody opened the door of her vehicle and Defendant got
12  in because he "didn't know what else to do." Hearing Tr. (5/17/2016) at 12:21 p.m. Detective Cody
13  closed the door of the vehicle, walked around it and got in on her side. Hearing Tr. (5/17/2016) at
14  12:21 p.m. Defendant did not receive a copy of the search warrant until he was already in the
15  vehicle, and did not read it because Detective Cody explained it to him, and because it was a very
16  thick stack of papers. Hearing Tr. (5/17/2016) at 12:22 p.m., 12:34 p.m., 12:41 p.m. He only knows
17  what it says because he read it later in his discovery. Hearing Tr. (5/17/2016) at 12:22 p.m., 12:34
18  p.m. Defendant never asked Detective Cody what the search warrant was. Hearing Tr. (5/17/2016)
19  at 12:41 p.m. He never asked for a moment to take a look at the search warrant. Hearing Tr.
20  (5/17/2016) at 12:41 p.m. Defendant never told Detective Cody that the search warrant was really
21  thick or asked for an explanation. Hearing Tr. (5/17/2016) at 12:41 p.m.

22  The recording of Defendant's statement shows that Detective Cody told him at the outset the
23  reason that law enforcement was present at his residence. Hearing Tr. (5/17/2016) at 12:35 p.m. She
24  told him they were looking for digital media and believed that someone at the residence was
25  downloading child pornography. Hearing Tr. (5/17/2016) at 12:35 p.m. Detective Cody then said
26  she wanted to make sure Defendant understood, and Defendant responded, "yes." Hearing Tr.
27  (5/17/2016) at 12:35 p.m. Throughout the statement, Defendant never asked for clarification because
28  he was still confused. Hearing Tr. (5/17/2016) at 12:36 p.m. Defendant also never asked Detective

1  Cody for time to read the search warrant, because "she just started talking." Hearing Tr. (5/17/2016)
2  at 12:36 p.m. Papers were ruffled during the recording of the statement; nonetheless, he did not
3  know that law enforcement officers were present to search his residence because they were
4  conducting a child pornography investigation. Hearing Tr. (5/17/2016) at 12:36 p.m.

5        While Defendant was in the vehicle, he saw an officer standing at the gate, approximately
6  10-13 yards away. Hearing Tr. (5/17/2016) at 12:24 p.m. The officer was standing on the side
7  behind the car, so Defendant did not look at him. Hearing Tr. (5/17/2016) at 12:24 p.m. Defendant
8  could not see the officer except through the vehicle's side view mirror. Hearing Tr. (5/17/2016) at
9  12:30 p.m. Defendant's residence was to his right. Hearing Tr. (5/17/2016) at 12:30 p.m. While
10 speaking to Detective Cody, Defendant faced away from his residence. Hearing Tr. (5/17/2016) at
11 12:31 p.m. Defendant never told Detective Cody he understood the *Miranda* warnings and he did
12 not, in fact, understand his rights. Hearing Tr. (5/17/2016) at 12:25 p.m., 12:37 p.m. During the
13 statement, however, he never told Detective Cody that he did not understand his rights. Hearing Tr.
14 (5/17/2016) at 12:37 p.m. Defendant said he could not ask her about his rights because he did not
15 understand them; however, he admitted that he did ask questions of Detective Cody during the
16 interview. Hearing Tr. (5/17/2016) at 12:37 p.m.

17       When Detective Cody talked to Defendant about leaving or staying at the residence and
18 explained that he would have to stay in one place if he stayed and would have to pay for a locksmith
19 if he left, Defendant asked her what she meant. Hearing Tr. (5/17/2016) at 12:37-12:38 p.m. He
20 explained that he asked for clarification because that was a subject he understood. Hearing Tr.
21 (5/17/2016) at 12:38 p.m. He never, however, asked for clarification about his rights because "I
22 didn't know the rights." Hearing Tr. (5/17/2016) at 12:38 p.m.

23       Detective Cody told Defendant that he was not under arrest, and that he was free to leave.
24 Hearing Tr. (5/17/2016) at 12:38 p.m. Defendant never asked if he could leave, or what Detective
25 Cody meant when she told him he could leave. Hearing Tr. (5/17/2016) at 12:38 p.m. Instead,
26 Defendant spoke to Detective Cody for approximately 15 minutes. Hearing Tr. (5/17/2016) at 12:38
27 p.m.
28

1       When Detective Cody told Defendant he could stay or leave, Defendant said, "Oh, I'm not
2  leaving." Hearing Tr. (5/17/2016) at 12:42 p.m. He testified that he told her he would stay because
3  he did not want to pay a locksmith. Hearing Tr. (5/17/2016) at 12:42 p.m. Defendant did not feel
4  that he could leave Detective Cody's vehicle, he thought that he would have to run from the police
5  if he left the vehicle. Hearing Tr. (5/17/2016) at 12:26 p.m., 12:42 p.m. He never asked for
6  clarification on that issue, though he did ask for clarification on other issues during the time he spoke
7  with Detective Cody. Hearing Tr. (5/17/2016) at 12:43 p.m. Defendant only asked for clarification
8  on issues that he understood. Hearing Tr. (5/17/2016) at 12:43 p.m.

9       During the time he spoke with Detective Cody, Defendant could see one or two officers
10 standing outside, but was unaware of any officers inside his residence. Hearing Tr. (5/17/2016) at
11 12:27 p.m. During his interview with Detective Cody, a SWAT officer or two remained on the
12 scene. Hearing Tr. (5/17/2016) at 12:39 p.m. The remaining SWAT officers did not point a gun at
13 Defendant during his conversation with Detective Cody. Hearing Tr. (5/17/2016) at 12:39 p.m.
14 Defendant did not see people going in and out of his residence during the conversation. Hearing Tr.
15 (5/17/2016) at 12:40 p.m. Defendant was not restrained while he was in Detective Cody's vehicle.
16 Hearing Tr. (5/17/2016) at 12:40 p.m.

17      After Defendant finished speaking with Detective Cody, she opened his door and walked
18 with him into his residence, where Detective Cody handed him to another officer. This officer told
19 Defendant to sit on a couch. Hearing Tr. (5/17/2016) at 12:28 p.m. At one point, Defendant wanted
20 to move to a different couch to see the television better, but the officer said he could not move
21 because the officer needed to see what he was doing. Hearing Tr. (5/17/2016) at 12:28 p.m. This
22 officer watched Defendant until the search was completed. Hearing Tr. (5/17/2016) at 12:28 p.m.

23      **C.    Testimony of Officer Mark Linebarger**

24      Officer Linebarger has been employed with LVMPD for 21 years and, as part of that
25 employment, assigned to SWAT for the past ten years. Hearing Tr. (6/27/2016) at 12:41 p.m. The
26 SWAT report regarding this search warrant was prepared by Officer Linebarger. Hearing Tr.
27 (6/27/2016) at 12:43 p.m. The report lists each SWAT officer involved in this case, as well as the
28 responsibilities and weapon carried by each officer. Hearing Tr. (6/27/2016) at 12:44 p.m.-12:46

- 9 -

1    p.m. The report indicates that the residence has a security door and, pursuant to LVMPD policy,
2    SWAT is required to serve the search warrant any time a residence has fortification. Hearing Tr.
3    (6/27/2016) at 12:48 p.m. Officer Linebarger cannot recall the procedure for requesting SWAT
4    assistance in 2013 because it has changed so many times - whether it involved sending an e-mail or
5    filling out a form, or an action plan. Hearing Tr. (6/27/2016) at 12:49 p.m.

6    That warrant service plan indicates that the reason SWAT's assistance has been requested
7    is fortification - a metal security gate on the front door. Hearing Tr. (6/27/2016) at 12:50 p.m.
8    Pursuant to LVMPD policy, since the door was fortified, SWAT was required to make entry to serve
9    the search warrant. Hearing Tr. (6/27/2016) at 1:15 p.m. Officer Linebarger is unaware of the
10   SWAT team receiving any information about Facebook pictures of weapons. Hearing Tr.
11   (6/27/2016) at 12:51 p.m.

12   The SWAT plan in this case was the surround and call-out plan, which is the "most
13   forgiving" of all SWAT plans. Hearing Tr. (6/27/2016) at 12:51 p.m. In that plan, SWAT pulls up
14   in vehicles, and communicate to the inside of the residence with a public address system. Hearing
15   Tr. (6/27/2016) at 12:51 p.m. In the instant case, SWAT tried to call inside the residence with a
16   phone number provided to them. Hearing Tr. (6/27/2016) at 12:51 p.m. Once the call-out is made,
17   the plan changes depending on the response from the people inside the residence. Hearing Tr.
18   (6/27/2016) at 12:51 p.m. Nothing in the search warrant references weapons. Hearing Tr.
19   (6/27/2016) at 12:54 p.m. Additionally, the cover sheet to the service plan says no weapons.
20   Hearing Tr. (6/27/2016) at 12:54 p.m. Nonetheless, it is "entirely possible" that weapons were
21   present at the location, but not reported to SWAT. Hearing Tr. (6/27/2016) at 1:16 p.m.

22   The SWAT officers approached the residence in two armored vehicles, which are black in
23   color with Police markings all over them. Hearing Tr. (6/27/2016) at 12:55 p.m. When a person
24   initially looks out of the residence, a person will not see the SWAT officers. The SWAT officers
25   can be heard speaking over the public address system, but all that can be seen are the vehicles.
26   Hearing Tr. (6/27/2016) at 12:56 p.m. A person won't actually see the SWAT officers until they
27   take the person into custody. Hearing Tr. (6/27/2016) at 12:56 p.m. SWAT officers wear helmets,
28   eye protection, tac vests with equipment and Police markings, and shirts with Police markings all

1  around them. Some officers have duty belts. The tac vests have ballistic protection. Hearing Tr.
2  (6/27/2016) at 12:57 p.m. No SWAT member used any of the weapons that were present - the public
3  address system was the only tool used by SWAT during the time they were present at Defendant's
4  residence. Hearing Tr. (6/27/2016) at 1:16 p.m.

5        In the instant case, SWAT initially attempted to reach the residents on the telephone, but
6  were unsuccessful. Hearing Tr. (6/27/2016) at 12:59 p.m. SWAT Officer Lewis then used the
7  public address system to call Defendant out of the residence. Hearing Tr. (6/27/2016) at 12:59 p.m.
8  Defendant came to the front door, and SWAT officers then called him out to a specific vehicle,
9  where the officers are protected by a shield. Hearing Tr. (6/27/2016) at 1:00-1:01 p.m. It is SWAT's
10 practice, as the person gets to a certain point, to have the person turn, put his hands in the air and
11 walk backwards toward the sound of the SWAT officer's voice. Hearing Tr. (6/27/2016) at 1:01
12 p.m. Once Defendant got to the front of the shield, a SWAT officer reached for his hands and pulled
13 him over, then put his wrists into zipties behind his back. Hearing Tr. (6/27/2016) at 1:02 p.m. He
14 was moved to the back of the SWAT vehicle in case someone else was inside the residence. Hearing
15 Tr. (6/27/2016) at 1:02 p.m. SWAT detained and debriefed Defendant to determine if there is
16 anything inside that could harm the officers such as weapons, dogs, or booby traps, or any other
17 person, then cleared the residence. Hearing Tr. (6/27/2016) at 1:02 p.m., 1:16-1:17 p.m. The SWAT
18 officers only asked safety questions prior to making entry into the residence, for officer safety, and
19 told Defendant they were here for his safety, and to protect him, and that the case detectives would
20 talk to him about the case. Hearing Tr. (6/27/2016) at 1:06-1:07 p.m. In the instant case,
21 approximately nine SWAT officers went inside to clear the residence. Hearing Tr. (6/27/2016) at
22 1:05 p.m. Prior to clearing the residence, SWAT officers passed Defendant off to task force
23 detectives. Hearing Tr. (6/27/2016) at 1:03 p.m.

24       SWAT arrived at the residence at 10:09 a.m., landed and started the phone calling process.
25 Hearing Tr. (6/27/2016) at 1:08 p.m. SWAT turned everything over to task force detectives and left
26 the premises at 10:20 a.m. Hearing Tr. (6/27/2016) at 1:09 p.m. No SWAT officers were left on
27 the scene after 10:20 a.m., as SWAT leaves as an entire unit. Hearing Tr. (6/27/2016) at 1:15 p.m.
28 The CAD report has a different time for SWAT leaving than the SWAT report drafted by Officer

- 11 -

1  Linebarger, but SWAT has its own channel and its communications therefore do not occur directly
2  with dispatch. Hearing Tr. (6/27/2016) at 1:10 p.m. The CAD report refers to communications
3  between detectives on scene and dispatch. Hearing Tr. (6/27/2016) at 1:11 p.m. The times that
4  Officer Linebarger placed in his SWAT report are the times that the SWAT officers wrote in their
5  notebooks and are the accurate times for SWAT's arrival and departure. Hearing Tr. (6/27/2016)
6  at 1:11-1:12 p.m. The times in and out of the scene are written as they occur. Hearing Tr.
7  (6/27/2016) at 1:14 p.m.

### D. Testimony of Detective Cody

On rebuttal, Detective Cody testified that the images in Government's Exhibit 3 are some images posted on Defendant's Facebook page. Some of the images depict Defendant and Defendant's minor child. In addition, one of the images depicts a semi-automatic handgun with several magazines loaded with different types of ammunition. Hearing Tr. (6/27/2016) at 1:19 p.m.-1:21 p.m. When he posted the picture of the handgun and three magazines to his Facebook page, Defendant commented, "This is my new baby...legal too....." Hearing Tr. (6/27/2016) at 1:21 p.m. Additionally, Defendant posted a close-up picture of the tops of the three magazines and commented, "A different tip for every clip....." Hearing Tr. (6/27/2016) at 1:21 p.m. During the execution of the search warrant, law enforcement seized the handgun from Defendant's Facebook picture, which was not legally registered. Hearing Tr. (6/27/2016) at 1:21 p.m.-1:22 p.m.

Detective Cody did not send a copy of the Facebook images to the SWAT team. Hearing Tr. (6/27/2016) at 1:22 p.m. Detective Cody said the request for SWAT is usually made via e-mail and a SWAT request form. Hearing Tr. (6/27/2016) at 1:22 p.m. Detective Cody verified during the investigation that the minors in Defendant's Facebook pictures are his children. Hearing Tr. (6/27/2016) at 1:23 p.m.

## II. ANALYSIS

### A. Credibility of Witnesses

The Court ordered an evidentiary hearing because the facts presented in the parties' briefing contradicted each other. "The longstanding and repeated invocations in caselaw of the need of district courts to hear live testimony so as to further the accuracy and integrity of the factfinding

process are not mere platitudes. Rather, live testimony is the bedrock of the search for truth in our judicial system." *United States v. Thoms*, 684 F.3d 893, 903 (9th Cir. 2012). "[J]udges simply cannot decide whether a witness is telling the truth on the basis of a paper record and must observe the witnesses' demeanor to best ascertain their veracity - or lack thereof." *Oshodi v. Holder*, 729 F.3d 883, 892 (9th Cir. 2013) (internal citation omitted). *See also See United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000) (evidentiary hearing required where defendant demonstrates that a significant disputed factual issue exists); *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995) ("There can be no doubt that seeing a witness testify live assists the finder of fact in evaluating the witness's credibility").

During the evidentiary hearing in this matter, the Court had the opportunity to listen to the testimony of all witnesses, to observe and evaluate each witness' demeanor while testifying, and to weigh each witness' credibility. Having done so, the Court finds Detective Cody and Officer Linebarger's testimony credible. Both testified consistently to the facts, and both displayed calm demeanors throughout their testimony, on direct and cross examination. The Court does not, however, find Defendant's testimony fully credible. Defendant changed his version of the facts several times, particularly his description of his reactions and feelings throughout the day of the search. He appeared to testify to facts that he thought would help his legal position on the instant motion, rather than the facts as they actually occurred. As an example of the above, Defendant's version of the facts regarding which officer or officers were standing outside the vehicle while he spoke with Detective Cody varied throughout his testimony and even, at times, included first one SWAT officer and then two. Finally, Defendant's demeanor was hostile and argumentative on cross examination, further contributing to the Court's finding that his testimony was not fully credible.

### B. Suppression of Statement

Defendant asks this Court to suppress his statement because the interview constituted custodial interrogation, due to the show of force by SWAT and the fact that a resonable person would not feel free to leave. The United States argues that Defendant was not in custody at the time of his interview and, even if the Court were to determine that Defendant was in custody, he was given his *Miranda* warnings prior to interrogation.

Interrogation initiated by law enforcement officers after a suspect "has been taken into custody or otherwise deprived of his freedom of action in any significant way" must be preceded by *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *accord United States v. Wilson*, 666 F.2d 1241, 1246 (9th Cir. 1982). "In order to combat [the pressures inherent in custodial interrogation] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights." *United States v. Williams*, 435 F.3d 1148, 1151 (9th Cir. 2006) (quoting *Miranda*, 384 U.S. at 467).

The "touchstone" for *Miranda* warnings is whether the suspect was in custody when interrogated. *United States v. Barnes*, 713 F.3d 1200, 1205 (9th Cir. 2013) (citing *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980)). To determine whether an individual was in custody, the Court must examine the totality of the circumstances. *See Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The test is whether "a reasonable innocent person in such circumstances would conclude after brief questioning [that] he or she would not be free to leave." *United States v. Bassignani*, 575 F.3d 879, 883-84 (9th Cir. 2009) (quoting *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir.1981)). A *Miranda* warning functions both to reduce the risk that an involuntary or coerced statement will be admitted at trial and to implement the Fifth Amendment's self-incrimination clause. *Id*. at 1151. Thus, if a suspect in custody does not receive an adequate warning effectively apprising him of his rights before he incriminates himself, his statements may not be admitted as evidence against him. *Id*. at 1152. In determining whether a suspect was in custody, "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (*quoting California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

The determination of whether a defendant is in custody for purposes of the requirement to provide *Miranda* warnings is determined by examining the objective circumstances of the interrogation. *Stansbury*, 511 U.S. at 323. Because the Court is directed to examine the objective circumstances of the interrogation, the subjective views of either the suspect or the interrogating officer is not relevant to the determination of whether the defendant was in custody. *Id*. *See also United States v. Leasure*, 122 F.3d 837, 840 (9th Cir. 1997). The Ninth Circuit has identified five

factors relevant to the custody determination: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002).[4]

In looking at the first *Kim* factor, the language used to summon Defendant, the Court finds that, while Defendant was not restrained, Detective Cody asked Defendant if he would agree to speak with her. When he agreed, she asked him if he would walk with her to her vehicle, which he did. The Ninth Circuit has found that, where a defendant agrees to accompany officers, this factors weighs in favor of non-custody. *Bassignani*, 575 F.3d at 884. Therefore, as Defendant agreed to accompany Detective Cody, the Court finds that this factor weighs in favor of non-custody.

In evaluating the second *Kim* factor, the extent to which Defendant was confronted with evidence of guilt, the Ninth Circuit has found a defendant in custody "when the interrogator adopts an aggressive, coercive, and deceptive tone." *Bassignani*, 575 F.3d at 884. By way of contrast, the Circuit has found this factor to weigh in favor of non-custody when the officers "did not attempt to challenge [the defendant's] statements with other 'known facts' suggesting his guilt, they merely asked [him] about the allegations." *Id*. (quoting *United States v. Norris*, 428 F.3d 907, 913 (9th Cir. 2005). Detective Cody used an open, friendly tone throughout the entire interview, which lasted less than 15 minutes. *See* Exhibit 1. Defendant participated actively in the interview, even choosing offering more information than the question called for on at least one occasion. As in *Bassignani*, the "conversation was clearly consensual." 575 F.3d at 884. This factor, then, weighs in favor of non-custody.

The third *Kim* factor is the physical surroundings of the interrogation. Here, Defendant was interviewed, unrestrained, in the front seat of Detective Cody's vehicle, which was not outfitted with

---

[4]Defendant argues that the Court should apply the factors set out in *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008) in determining whether he was in custody during the interview. Docket No. 93 at 4-5. The decision in *Craighead*, however, hinged on the "uniqueness of an interrogation conducted within the suspect's home. *Craighead*, 539 F.3d at 1083. In the instant case, however, Defendant was not interviewed inside his home and, therefore, *Craighead* does not apply for the purpose of determining whether Defendant was in custody when interrogated in a vehicle outside his residence.

1  any sort of cage. The door next to Defendant was unlocked. Detective Cody was dressed in
2  plainclothes with her weapon hidden. She was the only person in the vehicle other than Defendant,
3  who sat right next to a door. The Court finds no indication that Defendant was interviewed in the
4  vehicle in order to isolate him from the outside world or to prevent him from contacting others.
5  Nonetheless, since Defendant was taken away from the residence for the interview, the Court in an
6  abundance of caution finds this factor neutral.

7  The fourth *Kim* factor is the duration of the detention. The Ninth Circuit has held that a
8  defendant is not in custody when he was interrogated for more than an hour. *United States v.*
9  *Crawford*, 372 F.3d 1048, 1052 (9th Cir. 2004) (*en banc*). The Circuit has also held that a defendant
10 who was interrogated for "approximately 45 minutes" was not in custody. *Norris*, 428 F.3d at 911.
11 Here, the interview lasted between 14 and 15 minutes. Defendant was additionally detained by
12 SWAT, prior to his interview with Detective Cody. The Court finds that the SWAT detention was
13 minimal - it could not have lasted longer than 11 minutes, and may have been shorter - and was done
14 for officer safety. Defendant was then handed off to another officer, and Detective Cody came upon
15 him within a half hour or so after that. SWAT was present because of the fortification on
16 Defendant's door. After calling Defendant out of the house, securing him and debriefing him to
17 make sure there was no danger in the house, SWAT made entry into the residence and then left the
18 scene. The Court therefore finds that this factor weighs in favor of non-custody.

19 The fifth and final *Kim* factor is the degree of pressure used to detain Defendant. The Ninth
20 Circuit has "consistently held that a defendant is not in custody when officers tell him that he is not
21 under arrest and is free to leave at any time." *Bassignani*, 575 F.3d at 886. *See also Crawford*, 372
22 F.3d at 1060 ("Perhaps most significant for resolving the question of custody, Defendant was
23 expressly told that he was not under arrest..."). Here, Defendant was told more than once that he was
24 not under arrest, that the warrant did not authorize officers to arrest him, and that he was free to leave
25 at any time. Finally, after the statement, Defendant left Detective Cody's car and was not arrested
26 that day. This factor, then, clearly weighs in favor of non-custody.

27 The Court therefore finds, based on the totality of the circumstances, and the *Kim* factors, that
28 a reasonable innocent person in the circumstances of this case would conclude after brief questioning

that he would be free to leave. Accordingly, the Court finds that Defendant was not in custody and the interview thus did not constitute custodial interrogation.[5]

## RECOMMENDATION

Based on the foregoing and good cause appearing therefore,

IT IS RECOMMENDED that Defendant Frankie Allen Peraza's Motion to Suppress Statement, Docket No. 61, be **DENIED**.

## NOTICE

Pursuant to Local Rule IB 3-2 **any objection to this Report and Recommendation must be in writing and filed with the Clerk of the Court within 14 days of service of this document.** The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This Circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 6th day of September, 2016.

_____
NANCY J. KOPPE
United States Magistrate Judge

---

[5] Since the Court has found that Defendant was not in custody at the time of the interview, *Miranda* rights were not required and the Court does not reach the issue of whether the rights given were adequate.